**P & B SERVICES, INC., Plaintiff,**

v.

**Michael CARDENAS,\* Administrator, Small Business Administration, Defendant.**

**Civ. A. No. 79–1788.**

United States District Court, District of Columbia.

Nov. 9, 1981.

---

\* This action was originally brought against A. Vernon Weaver, then Administrator of the Small Business Administration. Michael Cardenas, the present Administrator, has been substituted as defendant pursuant to Fed.R. Civ.P. 25(d).

Marc F. Efron, Crowell & Moring, Karen Shoos Lipton, Crowell & Moring, Washington, D. C., for plaintiff.

John H. E. Bayly, Jr., Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

The issue in this case is whether P&B Services, Inc. was a small business for the purposes of a set-aside contract for base maintenance at a naval submarine support base. Jurisdiction exists under 28 U.S.C.

§ 2201 (Supp.III 1979), 28 U.S.C. § 2202 (1976), 5 U.S.C. §§ 702 and 704 (1976) and 28 U.S.C. § 1331 as amended by Pub.L. 96–486 (Dec. 1, 1980).

P&B Services, Inc. (P&B) is a Washington corporation engaged in the business of providing services on a contract basis to the federal government and others. These services include janitorial and custodial services, commissary and food services, mail and messenger services and refuse collection services. P&B was certified as capable of providing base maintenance [1] services by the Small Business Administration in a letter from the District Director of the Seattle, Washington Regional Office of the Small Business Administration dated June 16, 1978.

In the spring of 1979, P&B submitted a bid for a base maintenance contract at a naval submarine support base in Kings Bay, Georgia. This contract was a set-aside contract for small businesses. Although P&B's bid was the lowest offer submitted, the contracting officer first requested a determination from the Small Business Administration of P&B's size before awarding the contract. The Seattle, Washington Regional Office of the Small Business Administration determined that P&B was indeed a small business eligible for the award of the Kings Bay contract. The contracting officer then issued a notice of successful offeror to P&B.

Three unsuccessful bidders, Gemini Services, Inc. (Gemini), Dyneteria, Inc. (Dyneteria) and Jets, Inc. (Jets), protested the award of the contract to P&B, claiming that P&B was not a small business for purposes of this particular contract. [2] The basis of their claim was that P&B's proposed bid included an agreement with Pan American World Airways, Inc. (Pan Am) that it would perform part of the services at Kings Bay. Pan Am, needless to say, is not a small business.

The agreement between P&B and Pan Am specified that the latter would perform all required services for certain portions of the Kings Bay base. The serviceable area was divided into a total of 15 parts or annexes. Pan Am was to perform all services for five of these annexes and further provide consultant services as mutually agreed upon between P&B and Pan Am. Pan Am was to be paid a fixed price for its part of the contract, subject to modification under a complex formula.

The three protesters argued that this arrangement between P&B and Pan Am constituted a joint venture. If the agreement formed a joint venture, P&B was not eligible for the Kings Bay contract since a small business may not join with a non-small business in a joint venture and still receive a small business set-aside contract. [3] P&B, on the other hand, argued that its only relationship with Pan Am was through a subcontract for a specific portion of its main contract. Since subcontracting by a small business in a set-aside contract for

---

**1.** Base maintenance is defined in the federal regulations governing small business set-aside contracts as follows:

   "Base maintenance" means furnishing at an installation within the several States, Commonwealth of Puerto Rico, Virgin Islands, the Trust Territory of the Pacific Islands, or the District of Columbia, three or more services which may include but are not limited to such maintenance activities as janitorial and custodial services, protective guard services, commissary services, base housing maintenance, fire prevention services, safety engineering services, messenger services, grounds maintenance and landscaping services, and air-conditioning and refrigeration maintenance; *Provided, however,* That whenever the contracting officer determines prior to the issuance of bids that the estimated value of one of the foregoing services constitutes more than 50 percent of the estimated value of the entire contract, the contract shall not be classified as base maintenance but in the industry in which such service is classified. 13 C.F.R. § 121.3–2(e) (1979).

**2.** *See* 13 C.F.R. § 121.3- 5 (1979).

**3.** Two business concerns which are engaged in a joint venture are considered to have the power to control each other through their contractual relationship, and are therefore considered as affiliated for size determination purposes. 13 C.F.R. § 121.3–2 (1979). The determination of the size of a business includes its affiliates. 13 C.F.R. § 121.3–8 (1979).

services is permissible under certain circumstances, even if the subcontractor is not another small business,[4] P&B urged that its bid for the Kings Bay contract was proper.

The Seattle, Washington Regional Office of the Small Business Administration determined, for the second time,[5] that P&B Services, Inc. was eligible for the Kings Bay set-aside contract since (1) P&B's average annual receipts for the past three years had not exceeded $7,500,000[6] and (2) P&B and Pan Am were in a contractor/subcontractor relationship and were not engaged in a joint venture. Two of the three protesters, Dyneteria and Jets, appealed this determination to the Size Appeals Board of the Small Business Administration (the Board).[7] The Navy nonetheless formally awarded the contract to P&B since it was urgent that work on the base begin.[8]

The Size Appeals Board received a series of written communications from the protesters setting forth their allegations and from P&B responding to their attack.[9] On May 11, 1979, the Board denied P&B's request for an oral hearing and announced its decision that P&B and Pan Am were engaged in a joint venture, and that therefore, for the purposes of the contested contract, P&B was other than a small business.[10] P&B requested the Board to reconsider its decision,[11] but the Board refused to do so.[12] P&B then instituted this action for declaratory and injunctive relief to review and overturn the Size Appeals Board's decision.

Plaintiff P&B alleges that the Size Appeals Board's decision suffers from two major shortcomings. First, the plaintiff argues that the finding of a joint venture between P&B and Pan Am was not proper since the Board did not find any "joint profit" between the two. Plaintiff points to the federal regulation promulgated under the Small Business Act, 15 U.S.C. § 637(b)(6) (1976), which defines joint venture for size determination purposes:

Definition of a joint venture for size determination purposes. A joint venture, for size determination purposes, is an association of persons or concerns with interest in any degree or proportion by way of contract, express or implied, consorting to engage in and carry out a single business venture, such as a Government contract, for joint profit for which purpose they combine their efforts, property, money, skill, or knowledge, but without creating a corporation or partnership in the legal or technical sense of the term.

13 C.F.R. § 121.3–2(a)(vii)(A) (1979). Plaintiff reads this regulation to mean that "joint profit" is a necessary element of a joint venture. Since the Board did not find any "joint profit" in the arrangement between P&B and Pan Am, plaintiff contends that its finding of a joint venture was contrary to the Board's own regulation governing its fact-finding process.

Second, plaintiff disputes the Board's insistence that P&B failed to respond to cer-

---

4. *See* McBride & Touhey, Government Contracts §§ 48.220[2]–[3] (1978 and Supp.1981) and cases cited therein.

5. Technically speaking, however, the Regional Office may not have made a "size determination" in responding to the contracting officer, although the record is not clear. *See* 13 C.F.R. §§ 121.3–2(y), 121.3–4(a) (1979).

6. This is the proper standard for concerns bidding on base maintenance contracts. 13 C.F.R. § 121.3–8(e)(4) (1979). It is not contested that P&B, standing alone, meets this requirement.

7. *See* 13 C.F.R. § 121.3–6 (1979).

8. The Navy made a Determination and Findings of urgency pursuant to Defense Acquisition Regulation §§ 1–703(b)(3)(iv) and 2–407.-8(b)(3) (1976) which facilitated award of the

contract to P&B despite the dispute concerning P&B's size.

9. 13 C.F.R. § 121.3–6(e) (1979) provides that "[t]he Size Appeals Board shall consider the appeal on the written submission by the parties. The Board may also in its discretion, conduct an oral inquiry."

10. Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979).

11. *See* 13 C.F.R. § 121.3–6(g)–(h) (1979).

12. Letter from Size Appeals Board Chairperson to P&B's counsel dated June 25, 1979 (Defendant's Exhibit III) (hereinafter Denial of Reconsideration letter).

tain allegations and to provide specific information. In its decision, the Board repeatedly states that P&B did not respond to a number of the accusations made by the protesters and to specific inquiries directed to P&B by the Board itself.[13] As the regulations state:

> If deemed necessary the Board may request additional specific information from the parties or other persons. In the case of refusal or failure to promptly furnish such information, the Board may assume that disclosure would be contrary to the interests of the party failing to make such disclosure.

13 C.F.R. § 121.3–6(e) (1979).[14] The Board clearly predicated many of its conclusions on its view that P&B had failed to respond and that silence must be construed accordingly.[15] Plaintiff asserts that the information which the Board requested and which the Board claims P&B refused to provide was either before the Board already, irrelevant to a size determination or confidential information which should not have become available to P&B's competitors simply because they persevered in their protest of the determination of P&B's size. In any case, plaintiff contends, none of the information which P&B allegedly refused to provide was such that the Board might reasonably have

inferred the existence of "joint profit" from plaintiff's alleged silence. Thus, plaintiff reasons, whether or not the Board's finding that P&B refused to provide information was correct, the necessary finding of "joint profit" could not have been made and thus the finding of a joint venture was not proper. Plaintiff therefore asks this court to overturn the Size Appeals Board's decision.

■■■ This court may review the agency's final determination, although the scope of that review must be strictly limited. *United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d 519 (D.C.Cir. 1978); *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166 (D.C.Cir.1973); *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir. 1970); *Kinnett Dairies, Inc. v. J. C. Farrow*, 580 F.2d 1260 (5th Cir. 1978); *Allen M. Campbell Co. General Contractors v. Lloyd Wood Construction Co.*, 446 F.2d 261 (5th Cir. 1971). The standard of review which must be applied to the Size Appeals Board's decision is whether the Board's determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as specified in 5 U.S.C. § 706(2)(A). *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).[16] The Court may not, of course,

---

**13.** Dyneteria, Inc. and Jets, Inc., SAB # 1259 (May 11, 1979) at 3–11 and Denial of Reconsideration letter at 2–4.

**14.** The Board's decision incorrectly cites and quotes 13 C.F.R. § 121.3–4(c) which, although it provides substantially the same message, is applicable to the initial size determination made by the Regional Office of the Small Business Administration. The Board had informed P&B in writing of the possibility that it would construe adversely any silence, again citing the wrong regulation. No prejudice, however, could have resulted from the Board's technical error in this respect.

**15.** The Board in its decision stated explicitly that P&B's "failure to respond is construed adversely against P&B. The failure to respond, as well as information already available, requires the conclusion that P&B and Pan Am are engaged in a joint venture." Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979) at 11. The only reason the Board gives for the denial of P&B's request for an oral hearing was that "[i]f P&B will not respond in writing to questions, there is no point in holding an oral hear-

ing." *Id.* Similarly, the denial of P&B's request for reconsideration is based largely on the Board's conclusion that P&B had not cooperated sufficiently earlier. *See* Denial of Reconsideration letter.

**16.** The Size Appeals Board's size determination is an informal agency adjudication, since "Size Appeals Board proceedings are essentially fact-finding and nonadversary in nature," 13 C.F.R. § 121.3–6(a) (1979), and an oral hearing is merely optional at the discretion of the Board, 13 C.F.R. §§ 121, 121.3–6(e) (1981). *See* Footnote 9 *supra*. In *Camp v. Pitts, supra*, the Supreme Court considered an analogous situation under the National Bank Act:

> No formal hearings were required by the controlling statute or guaranteed by the applicable regulations, although the latter provided for hearings when requested and when granted at the discretion of the Comptroller....
>
> . . . .
>
> ... Accordingly, the proper standard for judicial review of the Comptroller's adjudications is not the 'substantial evidence' test which is appropriate when reviewing findings

reform the agency's decision simply because it would have reached a different result. *Kentron Hawaii, Ltd. v. Warner, supra; M. Steinthal & Co. v. Seamans*, 455 F.2d 1289 (D.C.Cir.1971); *Allen M. Campbell Co. General Contractors v. Lloyd Wood Construction Co., supra; John W. Danforth Co. v. Veterans Administration*, 461 F.Supp. 1062 (W.D.N.Y.1978). This deference is even more important when reviewing the agency's interpretation of its own regulation, the crux of plaintiff's claim in the instant case. "The Supreme Court has repeatedly stated that although an agency interpretation may not be the only one permitted by the language of a provision, if the agency interpretation is a reasonable one, the courts must respect it." *Kinnett Dairies, Inc. v. J. C. Farrow, supra*, 580 F.2d at 1273. *United States v. Larianoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *United Steelworkers of America, AFL–CIO–CLC v. Marshall*, 647 F.2d 1189, 1228 (D.C.Cir.1980). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

The regulation at issue here is that defining joint venture, 13 C.F.R. § 121.3–2(a)(vii)(A) (1979), as quoted above. The Size Appeals Board found that the relation-

ship between P&B and Pan Am was a "combination by two concerns of their efforts, skill, or knowledge" and was therefore a joint venture.[17] The Board did not specifically find that there would be any "joint profit" between P&B and Pan Am, although its decision suggests that it was suspicious of the "numerous complicated clauses related to price adjustment"[18] and that Pan Am "will be performing directly or indirectly in more annexes than stated, and its compensation will not be limited to the amounts represented by P&B."[19] For purposes of review, however, it may be assumed that the Board did not find any "joint profit," nor did it consider "joint profit" necessary for its finding that P&B and Pan Am were engaged in a joint venture. In other words, the Board did not read the regulation as providing some sort of checklist, each element of which must be fulfilled before a finding of joint venture would be appropriate.[20]

The Board's interpretation of this regulation is a reasonable one. "Joint venture" is not an easy concept for which to provide a definition so specific that any arrangement between parties might be measured by it. In attempting to provide the most useful definition, one must not lose sight of the basic purposes of the Small Business Act. As Chief Judge Brown of the Fifth Circuit stated:

made on a hearing record, 5 U.S.C. § 706(2)(E). Nor was the reviewing court free to hold a *de novo* hearing under § 706(2)(F) and thereafter determine whether the agency action was 'unwarranted by the facts.' It is quite plain from our decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971), that *de novo* review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce administrative actions. *Id.* at 415 [91 S.Ct. at 823]. Neither situation applies here. . . .

The appropriate standard for review was, accordingly, whether the Comptroller's adjudication was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' as specified in 5 U.S.C. § 706(2)(A).

*Id.* at 138–42, 93 S.Ct. at 1244. *But see Allen M. Campbell Co. General Contractors v. Lloyd Wood Construction Co., supra.*

17. Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979) at 10.

18. *Id.* at 8.

19. *Id.* at 11.

20. Other size determinations by the Size Appeals Board indicate that it has not considered "joint profit" or any other single factor essential to a joint venture. *See, e. g.*, Fred H. Slate Co., SAB # 1293 (Sept. 29, 1979); Salmon River Lumber Co., SAB # 1267 (June 5, 1979); Frontier Science Assocs., SAB # 1247 (Mar. 22, 1979). *But see* Norfolk Dredging Co., SAB # 129 (Feb. 26, 1975) (dicta stating that sharing of profits is essential, but no finding of joint venture or facts supporting that finding are given).

Our decision must necessarily be influenced by the declared Congressional policy embodied in the Small Business Act to 'aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise.' 15 U.S.C.A. § 631. This broad aim is supplemented by programs providing for special financing through Small Business Investment Companies, 15 U.S.C.A. § 661 et seq. and preferred tax treatment for small business corporations, 26 U.S.C.A. § 1371 et seq. Inherent in the statutory plan is a legislative aim to provide small businesses with significant competitive advantages not available to others, as indicated by the Administrator's authority to insure that small businesses receive *any* award or contract or *any* part thereof after determining such action 'to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the Government are placed with small-business concerns,' 15 U.S.C.A. § 644(3). The preferred treatment accorded to small businesses under the Act and the latitude given the Administrator to achieve it are thus primary components in our analysis.

*Allen M. Campbell Co. General Contractors v. Lloyd Wood Construction Co., supra*, 446 F.2d at 263–64.

Although the statute promises aid to small businesses, it does little to tell us when a business should be considered small. The Act describes a small business as "one which is independently owned and operated and not dominant in its field of operation." 15 U.S.C. § 632 (Supp. III 1979). The Act also grants the Administrator broad rulemaking power to refine the definition of a small business through standards for size determinations. 15 U.S.C. § 634(b)(6)

(1976). The regulations at 13 C.F.R. § 121.3 et seq. *(1979) were promulgated to achieve this end.*

The definition of a small business in the regulations begins by repeating the language in the statute, with one important addition:

A small business concern for the purpose of Government procurement is a concern, *including its affiliates*, which is independently owned and operated, is not dominant in the field of operation in which it is bidding on Government contracts . . . .

13 C.F.R. § 121.3–8 (1979) (emphasis added). The size of a business, then, includes its affiliates. The regulations go on to establish specific size limits for various types of business concerns [21] and to further attempt to distinguish an independently owned and operated small business from one affiliated with a large concern.[22] The focus of this inquiry rests primarily on who controls whom:

Concerns . . . are affiliates of each other when either directly or indirectly (1) one concern controls or has the power to control the other, or (2) a third party or parties controls or has the power to control both. In determining whether concerns are independently owned and operated and whether or not affiliation exists, consideration shall be given to all appropriate factors, including common ownership, common management, and contractual relationships . . . .

13 C.F.R. § 121.3–2(a) (1979). The potential for control, whether or not actually exercised, renders the two concerns affiliates of each other.[23]

More specifically, the regulations speak of "control through stock ownership,"[24] control through "voting trusts,"[25] "control

---

**21.** *See* 13 C.F.R. § 121.3–8 (1979).

**22.** *See Id.*; 13 C.F.R. § 121.3–2 (1979).

**23.** 13 C.F.R. § 121.3–2(a)(i) (1979) provides: Nature of Control. Every business concern is considered as having one or more parties who directly or indirectly control or have the power to control it. Control may be affirma-

tive or negative and it is immaterial whether it is exercised so long as the power to control exists.

**24.** 13 C.F.R. § 121.3–2(a)(iii) (1979).

**25.** 13 C.F.R. § 121.3–2(a)(v) (1979).

through common management"[26] and "control through contractual relationships."[27] The regulation defining joint venture at issue here falls under "control through contractual relationships." Viewed in this context, then, the joint venture regulation is part of a larger scheme to limit participation in programs such as set-aside contracts to those small businesses which are not controlled by large businesses.

The Board's interpretation of the regulation was that it should scrutinize P&B's relationship with Pan Am for indications that one might be able to control the other. The Board considered such factors as cooperation between P&B and Pan Am in preparation of the proposal, whether the proposal delineated clearly who would perform which tasks, and who provided personnel and financing, in order to conclude that P&B and Pan Am's relationship was a single venture. The Board did not find "joint profit," nor did it need to in order to conclude that the other indications of cooperation and control were sufficient to support its finding of joint venture.[28] Accordingly, the Board's interpretation of the regulation as not requiring a finding of "joint profit" as a necessary element of a joint venture must stand.

█ The question remains, however, whether the Board applied that regulation arbitrarily or capriciously in this case. Although the basis for the Board's findings need not be evidence of "joint profit," its determination must nonetheless be based on the record before it. The Board's decision indicates that an important consideration in its finding of joint venture was its finding that P&B failed to respond to a number of allegations and inquiries. The Board construed P&B's silence as an indication that disclosure would have been contrary to P&B's interests, and decided accordingly.[29] P&B alleges that this finding was not supported by the record before the Board at the time it made its determination.

Plaintiff admits that it was less than fully cooperative and responsive to the Board. P&B should not have assumed, as it did, that any information was before the Board simply because it had been provided to some government agency at some other time and place. As such, the Board was correct in construing adversely plaintiff's "refusal or failure to promptly furnish" information, as stated in the applicable regulation, 13 C.F.R. § 121.3–6(e) (1979). This regulation does not, however, empower the Board to decide the entire matter adversely solely because a party fails to responsively heed the Board's request for explanation. The Board must still consider all of the evidence before it, and cannot reach a determination absent a basis in the record merely out of pique at a particular party's obstinacy.

Careful examination of the Board's decision, its denial of reconsideration, the pleadings and exhibits submitted by both parties, and in camera inspection of the entire undeleted original file of the Small Business Administration as maintained by the Secretary of the Size Appeals Board reveals a number of instances where the Board's findings are contrary to undisputed evidence in the Board's possession at the time it reached its decision. For example, the contract between P&B and Pan Am[30] is on

**26.** 13 C.F.R. § 121.3–2(a)(vi) (1979).

**27.** 13 C.F.R. § 121.3–2(a)(vii) (1979).

**28.** To paraphrase the observation made by Judge Goldberg of the Fifth Circuit, in Kinnett Dairies, Inc. v. J. C. Farrow, supra, 580 F.2d at 1273, with respect to military procurement policy:

> Moreover, the regulation at issue here is merely a single strand in the broad fabric of ... [size determination] ... policy. The pattern on that fabric is unmistakable—it demonstrates a pervasive and powerful concern for ... [control of one concern by another] .... It makes little sense to this court to snip out of that fabric a single strand, and simply because it is ambiguously written, to read it as requiring an extreme and unique obsession with ... [joint profit] ....

**29.** 13 C.F.R. § 121.3–6(e) (1979). See Footnotes 14–15, supra.

**30.** The Board's decision indicates that this contract was in its possession at the time it reached its determination.

its face a subcontract for a specific portion of the prime contract. Nothing in the agreement reflects any intention to form a joint venture or to grant Pan Am control over P&B—or vice-versa—in any greater capacity than in a customary contractor/subcontractor relationship. The contract does allow P&B to receive unspecified additional consulting services from Pan Am, but this, standing alone, is not sufficient indication that the agreement was actually one creating a joint venture.

Additionally, the Board found that P&B was not "qualified to perform more than food service contracts" [31] and "also not qualified to act as prime contractor for the portion of the contract that Pan Am will admittedly do." [32] These findings are not supported by the record before this court, and are in direct contradiction to the June 16, 1978, letter from the District Director of the Seattle, Washington Office of the Small Business Administration to P&B which states clearly the determination that P&B's "capability be revised to include base maintenance." The Board's related conclusion that "P&B relied on the experience and expertise of Pan Am to qualify for the award with its proposal and through the preaward survey" [33] is also refuted by the only evidence in this respect before it: a letter dated March 22, 1979, from the Navy's counsel to the General Accounting Office explicitly stated that the Navy evaluated P&B's qualifications and experience completely separate from those of Pan Am in determining that P&B's bid offered the lowest dollar-to-quality point ratio. [34] In fact, the only support the Board provides for its findings of P&B's incompetency is an allegation by Jets, one of the protesters and

the next lowest bidder, that "one of . . . [Jets] . . . representatives visited the P&B offices in Tacoma regarding potential employment and he was informed by Mr. Altheimer of P&B that no action had been taken to secure employees, and anyway, that the P&B officials knew relatively little about the proposal or their employment needs because the proposal had been prepared by Pan Am and Pan Am was arranging for their staffing . . . ." [35] Mr. Altheimer, P&B's vice-president, emphatically denies this version of the conversation in his affidavit submitted in connection with this action, but apparently had not denied this allegation before the Board reached its decision. Even so, this accusation, weighed against the other evidence in the record, is an insufficient basis for the Board's far-reaching conclusions about P&B's competency.

Also, the Board found that there was "unusual cooperation between P&B and Pan Am in preparation of the proposal." [36] The record before this court shows otherwise. A letter from Pan Am to P&B, dated March 21, 1979, states that Pan Am prepared only the part of the proposal concerning the five annexes it was to service, and that P&B prepared the rest. [37] Indeed, Mr. Altheimer wrote to the Board's counsel on April 4, 1979, confirming a telephone conversation between the two on March 28, 1979, in which he explained exactly how the proposal was prepared. No other evidence appears in the record to indicate that P&B and Pan Am's cooperation would have been somehow unusual.

Finally, the Board determined that "P&B will be obtaining significant financial support, direct or indirect, from Pan Am in

---

31. Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979) at 6.

32. *Id.* at 11.

33. *Id.*

34. This letter was before the Board at the time it made its determination, since it is referred to

in the dissenting opinion to the Board's decision.

35. Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979) at 6.

36. *Id.* at 7.

37. The dissenting opinion to the Board's deci-

performance of the contract."[38] Three documents in the record refute this finding, while none support it. First, counsel for the Navy stated in his March 22, 1979, letter to the General Accounting Office that "[b]onding was provided by personal sureties of P&B and not by PAN–AM as alleged by the protesters."[39] Second, Pan Am's letter of March 21, 1979, to P&B states that bonding was obtained through P&B's "independent efforts and certainly without any financial backing from Pan Am."[40] Third, Mr. Altheimer's letter to the Board's counsel, dated April 4, 1979, explicitly stated that all financing for the contract was obtained without Pan Am's help through the Tacoma Commercial Bank. The letter provided the Bank's vice-president's name and telephone number for verification. Additional information submitted to the Board by plaintiffs in their request for reconsideration confirms this financing arrangement. In light of this record, even if P&B failed to respond to any further questions concerning its financing, silence construed adversely could not lead to the conclusion that Pan Am was financially supporting P&B.

In summary, it is evident that the Board's finding that P&B and Pan Am were engaged in a joint venture had no support in the record, even if P&B's lack of cooperation is construed against it, and was therefore arbitrary and capricious. P&B, accordingly, should have been denoted as a small business, eligible for the base maintenance contract at the Kings Bay base.

The defendant's size determination of May 11, 1979, is therefore vacated by the declaratory judgment issued this date, rendering moot the plaintiff's prayer for a permanent injunction.

---

sion reveals that this letter was in the record before the Board.

**38.** Dyneteria, Inc. & Jets, Inc., SAB # 1259 (May 11, 1979) at 12.

**39.** This letter was before the Board. *See* Footnote 34, *supra.*

**40.** The Board had this letter before it. *See* Footnote 37, *supra.*